FILED

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA
*EX REL.*
[UNDER SEAL]

PLAINTIFFS,

v.

[UNDER SEAL],

DEFENDANTS.

CASE NO.
8:19 cv 2969 T 36 CPT

**FILED IN CAMERA & UNDER SEAL**
**(AS REQUIRED BY 31 U.S.C. § 3730(b)(2))**

**NOT TO BE POSTED ON PACER**

***QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL**

TPA-59133
$400

FILED

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*EX REL.* CHRISTOPHER O'KEEFE<br><br>PLAINTIFFS,<br><br>v.<br><br>VITAS HEALTHCARE CORPORATION; VITAS HOSPICE SERVICES, LLC; VITAS HEALTHCARE CORPORATION OF FLORIDA; and CHEMED CORPORATION | CASE NO.<br><br>**FILED IN CAMERA & UNDER SEAL (AS REQUIRED BY 31 U.S.C. § 3730(b)(2))** |

## *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

1. Relator, Christopher O'Keefe, brings this action on behalf of the United States against Chemed Corporation and its subsidiaries Vitas Hospice Services, LLC, Vitas Healthcare Corporation, and Vitas Healthcare Corporation of Florida (collectively referred to herein as "Defendants" or "Vitas") under the False Claims Act, 31 U.S.C. §§ 3729 *et. seq*. (the "FCA") and alleges the following:

## OVERVIEW

2. Vitas is one of the largest for-profit hospice chains in the United States and provides hospice services to patients in their homes, assisted living facilities, skilled nursing facilities, hospitals, and hospice inpatient units.

3. Hospice providers are entitled to receive reimbursement from Medicare only for hospice services delivered to Medicare beneficiaries who are terminally ill. Medicare provides reimbursement for four levels of hospice care: routine home care, continuous home care, inpatient respite care, and general inpatient care. Most hospice care is routine care, and therefore should be billed as routine care. Hospice providers receive the highest reimbursement for continuous home care services (also called "crisis care"). Medicare's daily reimbursement rate for crisis care is approximately $800 more per patient than the daily reimbursement rate for routine home care.

4. Defendants are defrauding Medicare by billing for more expensive crisis care services when those services are not actually provided and/or are not medically necessary. In addition, Defendants are causing damages to the government by admitting and recertifying patients who are not eligible for hospice services.

5. In October of 2017, Defendants entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the Department of Health and Human Services pursuant to a False Claims Act settlement which involved covered conduct between 2002 and 2013 similar to the conduct alleged herein. The CIA stated that the "compliance obligations assumed by VITAS under this CIA shall be five years." Defendants are violating the clear terms of the CIA and are continuing to engage in the same types of fraudulent behavior that led to the previous settlement.

6. Relator has reported Defendants' improper conduct to Vitas management, but Defendants refuse to correct their improper practices and continue to engage in their fraudulent scheme to this day. Furthermore, Relator has information that Defendants fraudulent practices are continuing to occur on a systemwide basis at hospice locations across the country from Florida to California.

7. The majority of Defendants' patients are Medicare beneficiaries. Therefore, Defendants' fraudulent practices have caused and continue to cause substantial damages to the Medicare program.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345, 28 U.S.C. §1331, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

9. This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found in, resides in, transacts business in, or has committed acts related to the allegations in this Complaint in the Middle District of Florida.

10. Venue is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c) because at least one of the Defendants can be found in, resides in, or transacts business in the Middle District of Florida and because violations of 31 U.S.C. § 3729 discussed herein occurred in this judicial district.

## PARTIES

11. Relator, Christopher O'Keefe, resides in Florida and is a registered nurse (RN). Relator graduated from an accredited nursing program and obtained a registered nursing license

through the Florida Board of Nursing in 2014. He received a Bachelor of Science in Nursing (BSN) in 2017. He has worked as an RN at Capitol Regional Medical Center in Tallahassee, Florida and at Halifax Hospital in Daytona, Florida. From June 2016 until the present, he has been employed by Vitas and he currently works as an RN Case Manager. In 2017, he received the "Vitas Best Nurse" award.

12. Defendant Chemed Corporation ("Chemed") is a Delaware corporation and publicly traded company headquartered in Cincinnati, Ohio. Defendant Chemed also wholly owns Chemed RT, Inc., and Comfort Care Holdings Co.

13. Comfort Care Holdings Co. wholly owns subsidiaries that operate Vitas's for-profit hospices nationwide, including Defendants, Vitas Hospice Services, L.L.C., Vitas Healthcare Corporation, and Vitas Healthcare Corporation of Florida. Comfort Care Holdings Co. also wholly owns Vitas Healthcare Corporation of Illinois, Vitas Healthcare Corporation of California, Vitas Healthcare Corporation of Ohio, Vitas Healthcare Corporation of Atlantic, Vitas Healthcare of Texas, L.P., Vitas Healthcare Corporation Midwest, and Vitas Healthcare Corporation of Georgia.

14. Vitas's operations are based in Miami, Florida. Vitas operates for-profit hospice programs in 14 states (California, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas, Missouri, New Jersey, Ohio, Pennsylvania, Texas, Virginia and Wisconsin) and the District of Columbia. At all times relevant to this Complaint, Vitas was engaged in the business of providing hospice care to individuals who were Medicare beneficiaries. Vitas provides hospice services to patients in their homes, assisted living facilities, skilled nursing facilities, hospitals, and hospice inpatient units.

## REGULATORY BACKGROUND

15. Hospice is a program designed to provide patients with palliative care (care designed to relieve pain, symptoms or stress of terminal illness) instead of curative care (care designed to cure an illness or condition). To be covered under Medicare, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions. Medicare outlines the admission criteria for various illnesses.

16. Hospice is available to terminally ill individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided certain conditions are met. Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

17. In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20. According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

18. Medicare beneficiaries must elect hospice care and in doing so agree to forego curative treatment of their terminal illnesses. Patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their illnesses. For this reason, electing hospice care is a critical medical decision for a patient who has been informed that his or her death is imminent.

19. All healthcare providers like Vitas are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare. A provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services, and, in the case of hospice care, to know that Medicare only reimburses for services

that are reasonable and necessary for the palliation or management of terminal illness. 42 U.S.C. § 1395y(a)(1)(C).

20. To bill for hospice care, the hospice provider must ensure that a patient is terminally ill before the individual is faced with the decision to stop receiving medical care that could cure his or her illness. The hospice provider must have a written certification of terminal illness that, among other things, includes: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less; and (3) the signature(s) of the physician(s) attesting to these medical conclusions. 42 C.F.R. § 418.22. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 170 Fed. Reg. 70534-35.

21. For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group for the patient. 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22. The interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor.

22. Crisis care is for a patient who elects to receive hospice care at home, or in a long-term care facility such as a nursing home. Crisis care is provided when the (at-home or nursing home) hospice patient is experiencing a "brief period[] of crisis," and only as necessary to allow

the patient to remain at their residence. 42 C.F.R. § 418.302(b)(2). Medicare defines a brief "period of crisis" as "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms." 42 C.F.R. § 418.204(a).

23. To bill Medicare for crisis care, a hospice provider must provide care that is: (1) designed to palliate the patient's acute medical symptoms, (2) provided to the patient for at least eight hours in a 24-hour period, counted from midnight to midnight, and (3) predominantly nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP). 42 C.F.R. §§ 418.302, 418.204. If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services. Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for crisis care and must instead bill for routine home care.

24. Medicare requires that at least eight hours of primarily nursing care are needed to manage an acute medical crisis. Furthermore, "[w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care." Medicare Benefit Policy Manual, Chapter 9, § 40.2.1.

25. Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form." All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

26. On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

27. Federal law requires providers like Vitas that receive funds under the Medicare program to report and return any overpayments within specified time periods. 42 U.S.C. § 1320a-7k(d).

## FACTUAL ALLEGATIONS

28. Since June 2016, Relator has been employed by Vitas as a registered nurse and case manager overseeing the care of hospice patients in both home and institutional settings.

29. The majority of Relator's patients are located at Riviera Senior Living Facility in Holly Hills, FL and Opis Bridgeview Center in Ormond Beach, FL. Relator is responsible for approximately 20 patients on Team #221. The entire team is responsible for approximately 100 patients at any given time and has a manager, a patient care administrator, a doctor, 4 case managers, and 8 home health aides assigned to it. The composition of Relator's team is similar to approximately 16 other teams in Program 10, which comprises Volusia, Flagler and Putnam counties. There are approximately 12 additional programs in the state of Florida.

30. Medicare reimburses approximately $154 to $196 a day for patients receiving routine hospice care and approximately $997 a day for patients receiving crisis care.

31. Immediately upon beginning employment at Vitas, Relator observed that approximately half of his patients did not appear to meet the requirements to receive hospice care. In addition, approximately 10 percent of Relator's patients who were receiving crisis care

did not meet the necessary criteria for that elevated and more expensive level of care. Currently, Relator has worked for Vitas for more than 3 years and has treated hundreds of hospice patients during that time period. Based on his experience working for Vitas, Relator has determined that Vitas's improper practices with regard to medically unnecessary admissions, recertifications, and crisis care services continue unabated to this day.

32. Nurses from other teams within Program 10 have informed Relator that they have observed similar improper practices occurring within their teams.

33. Vitas employees at hospice locations in states other than Florida have also observed the same types of fraudulent practices. Defendants are continuing to engage in False Claims Act violations on a systemwide basis at multiple Vitas locations across the country.

**Defendants are submitting false claims for crisis care services.**

34. Defendants disregard Medicare regulations in order to increase their reimbursement from Medicare for crisis care services, which they know Medicare reimburses at a higher level than other hospice services. Defendants' practices lead to the submission of false or fraudulent claims to Medicare for crisis care services that were not actually provided to patients, that were inappropriately provided to patients, or that were not medically necessary because the patients were not in crisis during the periods that Vitas claimed it provided crisis care.

35. Defendants pressure their employees to increase the number of crisis care claims submitted to Medicare, without regard to whether the crisis care services are appropriate for patients, or whether the crisis care services have even been provided to Vitas's patients. Defendants' upper management sets aggressive goals for Vitas's staff to find beneficiaries for whom they can bill Medicare for crisis care.

36. Vitas markets crisis care services to patients and their families as "intensive comfort care" services without mentioning that in order to bill Medicare for these services at the higher rates, a patient has to be experiencing a short-term crisis and have acute medical symptoms. In addition, Defendants do not ensure that Vitas's medical staff are properly trained on the Medicare requirements for crisis care.

37. Vitas knowingly misled patients and their families to believe that the Medicare hospice benefit would routinely cover around-the-clock care for hospice patients, absent the requisite acute medical symptoms resulting in brief periods of crisis that must be present for crisis care to be covered by Medicare. Because of this marketing ploy, patients sometimes chose Vitas over other providers. Relator observed Defendants teaching their marketers to sell Vitas's crisis care as "what sets us apart from other hospices." However, the Medicare benefit is the same for patients regardless of the hospice program they choose.

38. Defendants routinely send their employees, including team managers and nurses, emails with a patient census showing the number of patients receiving crisis care. In those emails, Defendants improperly pressure the employees to increase the number of patients on crisis care regardless of whether the patients qualify for that level of care.

39. Defendants often attach a grid to the emails which shows the number of patients on crisis care ("CC ADC"), the number of patients Vitas would like to have labeled as being on crisis care ("Possible CC Census"), and the number of available staff. For example, on August 22, 2019, Relator received an email sent to 16 Vitas teams with the subject "cc grid tool." The grid showed CC ADC = 18 and Possible CC Census = 29. The email stated "Census is 18. I challenge you all to look at your patients . . . who can we better support at the bedside with CC?" Through these emails, Vitas pressures its employees to place patients on crisis care simply

because Vitas staff are available without regard to whether the patients actually require this higher, more expensive level of care.

40. On numerous occasions Relator observed patients being placed on crisis care simply because the staff at an assisted living facility (ALF) or long-term care facility (LTC) requested that Vitas provide services to a patient even though the patient was not in crisis and did not require "nursing care on a continuous basis at home." Defendants instructed Vitas's clinical staff to "just put them [patients] on crisis care" to keep Defendants' referral sources, such as ALFs and LTCs, happy in situations where the facilities really just wanted Vitas's staff to "babysit" a patient who didn't actually require continuous nursing services. Vitas knew that crisis care was not appropriate in these situations. Nevertheless, Vitas would instruct their nurses to falsify medical documentation in order to make it appear that crisis care was warranted and eligible for reimbursement under Medicare even though this increased level of care was not appropriate and did not qualify for reimbursement.

41. Defendants instructed their employees on how to craft their documentation to make it appear that crisis care was medically necessary even when it was not. Specifically, Vitas would tell their nurses to write CC for "increased agitation," "increased pain," or "change in level of consciousness" to falsely make it appear that the medical record justified crisis care.

42. Relator also became concerned that Vitas was labeling numerous patients as being on crisis care for several weeks at a time, instead of returning them, as required, to the appropriate lower level of care after being stabilized after their "brief period of crisis." An employee who had worked for Vitas for more than 10 years as an RN and manager told Relator about a patient who had been on crisis care with Vitas continuously for months. This patient not

only did not qualify for crisis care, but also was independent and had cooked meals for the crisis care staff, who were supposed to be providing the crisis care services to the patient.

43. In certain cases, Defendants were worried that the long lengths of the crisis care periods could draw suspicion from Medicare, and therefore, attempted to conceal the extended nature of the crisis care. For instance, if a patient had been fraudulently placed on crisis care for an extended period of time, Defendants would instruct employees to briefly take the patient off crisis care and then return them to crisis care. Defendants believed that if the crisis care period was not continuous, Medicare would have a more difficult time detecting Defendants' fraudulent scheme.

44. On more than one occasion, Relator was sent by Vitas to the homes of patients whom he was told needed crisis care, but when he arrived at their homes, he discovered that they were not in crisis. For example, at the beginning of 2019, Relator went to an assisted living facility to provide crisis care services to Patient A, who resided at the facility. However, when Relator arrived, he was surprised to learn that Patient A had left to go to an appointment with her podiatrist even though Vitas had labeled her as someone who was currently in crisis. When Relator reviewed Patient A's medical record, he realized that she did not qualify for crisis care. The medical record indicated that on January 28, 2019, Patient A had been placed on crisis care after experiencing a burning sensation after taking her medication. The notes in the patient's chart stated that when the Vitas nurse arrived at the ALF, Patient A was in the common room "in a chair watching TV" with "a pleasant demeanor." The patient's normal day to day breathing involved wheezing and grunting due to her COPD. Relator could not find any reason in the medical record that justified why Patient A had been placed on crisis care, especially since the

medical reason the ALF provided to request care from Vitas was the patient's sore throat as opposed to any type of respiratory distress.

45. Another one of Relator's patients (Patient B) was fraudulently placed on crisis care simply due to a scratch on her ear. Relator reviewed her medical record and determined that Defendants had initiated crisis care due to left ear bleeding which had been caused from a small abrasion in her ear resulting from scratching it. It was apparent to Relator that Defendants had put Patient B on crisis care unnecessarily for the purpose of billing Medicare at the higher reimbursement rate.

46. Despite Defendants' knowledge that they are submitting or causing the submission of false claims for crisis care services, Defendants continue to improperly market and excessively bill Medicare for these more expensive services.

**Defendants submitted false claims for patients who were ineligible for hospice services.**

47. Defendants are knowingly submitting or causing to be submitted false or fraudulent claims to Medicare for patients who are not "terminally ill" (prognosis of six months or less if their illness ran its normal course) and, therefore, are not eligible to receive hospice care. Defendants are also creating, submitting, or causing to be submitted documentation that falsely represents that certain Medicare patients are eligible for hospice when they are not.

48. Vitas's corporate culture encourages its marketing and clinical staff to admit and recertify as many patients as possible regardless of whether they are eligible for hospice. General managers expect their marketing departments and sales representatives to find referral sources and patients, and then evaluate and promote their employees based on meeting hospice admissions goals. For example, Vitas pays bonuses to its non-clinical staff based on the number of patients enrolled into Vitas's hospice program. At the beginning of each month, the Director

of Marketing sends out a monthly quota to each sales representative showing the minimum number of patients that the representative must admit into Vitas's hospice program in order to receive his/her monthly bonus. The quota varies based on the size of the sales representative's territory. Relator observed that in his program territory, the quota was usually set at approximately 15 to 20 new patients a month and the bonus usually equaled about $1500. Furthermore, if a sales representative exceeded the monthly quota, he/she not only received the $1500, but also was awarded additional money for the remainder of the month for each patient admitted after the quota had been met.

49. When Relator worked for Vitas as a Junior Marketing Representative for approximately 4 months, he became aware of a Vitas program, known as "Leadership," which Defendants implemented on a nationwide basis. The marketers at the various Vitas locations throughout the country with the highest volume of admissions were treated to lavish, week-long vacations in exotic locations such as Costa Rica.

50. Because of incentive structures, such as the "Leadership" program, Vitas managers and marketing staff admit ineligible patients to Vitas's hospice program even when nurses and doctors express that they do not believe those patients are terminally ill.

51. Relator is concerned that Vitas marketers promote hospice services by telling physicians that it is a way to "unload" their complicated patients. This philosophy is inconsistent with Medicare requirements, because a patient who elects hospice care under the Medicare program also chooses to stop receiving curative care for his or her illness. Marketers tell LTC managers and directors that the main benefit of electing hospice care for patients is that the hospice program will pay for durable medical equipment and medications, and will provide the patients with a personal doctor, nurse, social worker, chaplain, and home health aide that will

alleviate the workload from their own staff. Marketers also promise LTC facilities that if they admit 8 or more patients to Vitas's hospice program, they will be provided with a Vitas home health aide for a full 8 hours per day.

52. Defendants pressure medical staff to admit or readmit patients who are not eligible for hospice services. If members of the medical staff do not admit a patient they believe does not qualify, Vitas forces them to "reconsider" their decision until they finally give in and say the patient is eligible for the Medicare hospice benefit.

53. Relator and other case managers are routinely discouraged from voicing concerns that their patients do not qualify for hospice. Each week Vitas holds IDG meetings where Vitas discourages nurses who try to protest against Vitas's fraudulent practices. Defendants attempt to silence these employees by telling them that if Vitas's patient census number decreases, the job security of the clinical staff will be at risk.

54. Admission nurses are strongly discouraged from not admitting patients that they are sent to evaluate. They must first call the admitting doctor and senior general manager if they feel the patient does not qualify and go through every possible avenue in order to get the patient admitted. Relator has seen instances where Vitas will review all of the patient's medications to try to find a single cardiac medication to attempt to justify admitting the patient based on a cardiac diagnosis even though the patient does not actually qualify for hospice services.

55. Relator is also aware of situations where doctors have refused to certify ineligible patients, and the Vitas medical director has overruled the doctors and signed the certification in the absence of a justification for the hospice admission.

56. Defendants instruct clinical staff to falsify medical records to support a determination of hospice eligibility. On numerous occasions, Vitas has told Relator and other

clinical staff that they are not permitted to write in the medical record that the patient's health is improving even if it actually is improving. Vitas's clinical staff know that falsifying patient records is illegal, but they often follow Vitas's improper directives because Vitas management has threatened to fire them if they do not comply.

57. Vitas has an admission team which evaluates prospective patients. Once patients are deemed qualified for hospice care, they are immediately assigned to a team. In many cases, the admission team exaggerates or falsifies diagnoses (e.g. end-stage heart disease) in patient charts even though the usual symptoms associated with these diagnoses (e.g. shortness of breath, edema, use of oxygen) are not present and are not documented. The fact that the symptoms usually associated with these diagnoses do not exist, coupled with the fact that the supporting diagnostic tests (echocardiogram, lab values, radiological images) have not been performed, is evidence that Defendants are falsifying diagnoses to make it appear that patients are qualified for hospice care.

58. Defendants falsify patient charts in furtherance of their scheme. For example, Relator noticed patient charts with false Palliative Performance Scale (PPS) scores. PPS scores measure a patient's physical performance in 10% increments from 0% (deceased) to 100% (fully ambulatory and healthy). Relator was shocked to see that a Vitas nurse had recorded a falsely inflated PPS score for Patient C, who was one of the healthiest, most independent, hospice patients that Relator had encountered. When Relator confronted the nurse about the false PPS score, she told him, "I know [the patient] has a higher PPS, but they said we're not allowed to keep patients in hospice with scores above 50%." Therefore, the nurse recorded 40% when the score should have been at least 60% to make it appear that the patient should remain in hospice.

59. Defendants emphatically instruct their clinical employees not to change the PPS score "unless you are going to lower it." Recently, Relator attended an educational lunch where nurses from other Vitas locations were in attendance. One of the nurses raised her hand and stated, " I had a patient who was admitted after a hip fracture but has been requesting to start driving again and doing her own shopping so I thought I should make her a 60% but was told by Dr. Lippmann that we are not allowed to make PPS scores higher." Dr Ronald Lippmann, who is a Vitas team physician, told Relator's IDG team at a weekly meeting that an improved PPS score was the determining factor in Medicare denying payment for an entire benefit period for a patient [Patient D]. Dr. Lippman warned that if Vitas employees accurately document patient improvement, then there would be a negative financial impact on Vitas due to patients no longer qualifying for its hospice program. He then threatened the team by saying that if the Vitas employees allowed that to happen, the company would lose more money and the employees' jobs would be in jeopardy.

60. At one of the team meetings that Relator attended, a chaplain voiced his concern that Vitas was engaging in "massive Medicare fraud." Dr. Lippmann pulled the chaplain aside and attempted to calm him down.

61. Relator reported Vitas's improper practices to his direct supervisor who told him, "That's how it's done here, don't rock the boat." Despite this directive from his manager, Relator resolved to only report accurate information in the charts of patients for which he was responsible. Nevertheless, other Vitas employees routinely succumb to the pressure that Defendants place on them to further Defendants' fraudulent scheme.

62. Dr. Nammour, who was the Vitas Program 10 Medical Director, directed Vitas staff to, "Show drama in your notes. Do not document patient improvement." Dr. Nammour was subsequently promoted by Vitas to the position of Regional Medical Director.

63. Another medical director, Dr. Karnani, has also stated that Vitas staff are not allowed to document patient improvement. Vitas also conducts educational lunches and trainings for the purpose of instructing Vitas employees to make it appear that the patients are in decline. Vitas engages in these fraudulent practices in an attempt to justify the recertification of patients as being hospice eligible.

64. The fraudulent hospice admissions, recertifications, and crisis care that Relator observed were not isolated instances but rather are occurring on a systemwide basis. Relator not only continues to see for himself, but also continues to hear from other Vitas staff, that Defendants are engaging in these types of improper practices with regard to hospice patients almost every day.

65. Relator shared his concerns about Vitas's Medicare fraud with a former Vitas patient care administrator, who had recently left Vitas after being with the company for more than 10 years. As a patient care administrator, she had been involved with Vitas at the corporate level and had supervised Vitas RN case managers and team managers. She responded to Relator, "Get out while you can . . . when you're in it you don't see how deep and how bad it really is. When you get out you see the venom. Every place does not run like that."

66. Defendants' fraudulent scheme is not limited to the 16 teams within Vitas's Program 10 located in Florida. Relator's discussions with hospice nurses and knowledge of practices at other Vitas locations within and outside of Florida demonstrate that these fraudulent practices are frequent, widespread, and ongoing. Defendants are continuing to this day to take

advantage of hospice patients in order to defraud the Medicare program for their own financial gain.

**COUNT I**

**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

67. Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

68. Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

69. The United States, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

70. By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

**COUNT II**

**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

71. Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

72. Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

73. The United States, unaware of the falsity of the claims made and submitted by Defendants, and as a result thereof, paid money that it otherwise would not have paid.

74. By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

**COUNT III**

**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

75. Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

76. Defendants have knowingly avoided their obligation to return payments they have improperly received from government healthcare programs in violation of 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

77. By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

**PRAYER**

WHEREFORE, Relator prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et. seq.*;

2. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as the maximum civil penalty for each

violation of 31 U.S.C. § 3729 in accordance with 31 U.S.C. § 3729(a)(1)(G), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: December 4, 2019

Respectfully submitted,

Elaine J. Stromgren

ELAINE J. STROMGREN
Florida Bar No.: 0417610
**Wilbanks and Gouinlock, LLP**
Monarch Plaza
3414 Peachtree Rd., NE
Suite 725
Atlanta, Georgia 30326
Direct Dial: (813) 425-1039
Firm: (404) 842-1075
ejs@wilbanksgouinlock.com

MARLAN B. WILBANKS
THOMAS HART WILLOUGHBY
**Wilbanks and Gouinlock, LLP**
Monarch Plaza
3414 Peachtree Rd., NE
Suite 725
Atlanta, Georgia 30326
(404) 842-1075
mbw@wilbanksgouinlock.com
*(subject to pro hac vice admission)*

**Counsel for Relator**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by Certified Mail, Return Receipt Requested, this 4th day of December, 2019 to the following:

The Honorable William Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Civil Process Clerk
U.S. Attorney's Office - Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Elaine J. Stromgren
ELAINE J. STROMGREN